**MONUMENT BUILDERS OF PENNSYLVANIA, INC.,**

v.

**AMERICAN CEMETERY ASSOCIATION, et al.**

**No. CIV.A.84–3014.**

United States District Court, E.D. Pennsylvania.

March 18, 2002.

Mitchell A. Kramer, Rydal, PA, for movant.

John W. Purcell, Jr., Purcell, Krug & Haller, Harrisburg, PA, for respondent.

1. Sept. 14, 1988 Order at ¶2. It should be noted that ¶3 of this Order defined the plaintiff class somewhat differently as to a separate settlement with Matthews International Corporation.

*MEMORANDUM*

DALZELL, District Judge.

In filing a motion for contempt of the January 31, 1989 Consent Decree in this matter, plaintiff has in consequence raised a question that the Supreme Court reserved in 1997. As will be seen, the procedural posture is unusual, but as the issue involves an important question under Fed.R.Civ.P. 23, as construed against the Due Process Clause of the Fifth Amendment, we analyze that problem, and an antecedent one, at some length.

*Procedural Posture*

Plaintiff Monument Builders of Pennsylvania, Inc., a trade association, filed this case on June 20, 1984. Plaintiff sued as representative of a putative class against the American Cemeteries Association and many Pennsylvania cemeteries, alleging that those cemeteries inflated the prices of monuments consumers purchased from independent dealers by charging members of the plaintiff class outrageous and unnecessary fees to install monuments in the cemeteries. In essence, Monument Builders alleged that the defendant cemeteries and cemetery trade associations were engaging in anticompetitive practices designed to discourage consumers from purchasing cemetery memorials from independent dealers in favor of purchasing them from the cemeteries themselves. Plaintiff alleged that these practices violated the federal antitrust laws.

After four years of litigation, the parties executed a Settlement Agreement. Judge Troutman, who presided over the litigation, had certified a plaintiff class—consisting of "retail grave marker dealers throughout the Commonwealth of Pennsylvania selling retail and/or installing grave memorials of granite or bronze" [1]—*and* a defendant class—consisting of "[a]ll cemeteries and cemetery associations throughout the Commonwealth of Pennsylvania." [2] The Settlement Agreement detailed restrictions regarding what the cemeteries and the independent monument build-

2. *Id.* at ¶4.

ers were permitted to do about access to the cemeteries, set forth reasonable charges and fees that cemeteries may impose for the use of cemetery services and property, and indeed covered most aspects of the business relationships between members of the plaintiff class and members of the defendant class.

Of particular pertinence to the instant dispute is the Settlement Agreement's provision as to who is bound by that document. In its second paragraph, it states that "This Settlement Agreement shall be binding upon MBPA, and their officers, directors, employees, successors and assigns, as well as on members of the plaintiff class who do not file a timely election to opt out and upon the settling defendants, the names of which are listed on the attached Exhibit A, and their officers, directors, employees, successors and assigns, as well as on members of the defendant class who do not file a timely election to opt out." The cemetery involved in this controversy is said to be a defendant class member and not a listed defendant.

Judge Troutman on January 31, 1989 entered an Order that approved the twenty-page Stipulation and Settlement Agreement and, in its last paragraph, reserved "jurisdiction over the effectuation of the settlement" without a terminal date. *See* January 31, 1989 Order at 4. Since Judge Troutman entered that Consent Decree, the plaintiff class has from time to time filed motions for contempt or compliance with the Consent Decree. On June 15, 1998, upon Judge Troutman's retirement, the Chief Judge reassigned this matter to our docket.

### The Current Motions

The instant motion for contempt arose when, some time in early 2001, it came to the plaintiff's attention that Orchard Hills Cemetery and Memorial Park, a cemetery in Shamokin Dam, Pennsylvania, was operating in a way that plaintiff class member Fantini Monuments Co. believed was contrary to the

Consent Decree. Fantini, which is also a member of plaintiff, asked plaintiffs' class counsel to take action, and on March 14, 2001, counsel mailed a bellicose letter to Orchard Hills's owner, Ms. Cynthia Gee, demanding compliance. Ms. Gee replied a week later, and suffice it to say that the current legal dispute ensued, with Ms. Gee's company, C GEE, Inc., filing its own cross-motion for contempt against Fantini.[3]

At the outset, and before reaching the merits of the controversy between these parties, we must address C GEE's threshold objection that is not subject to the Consent Decree at all. In order to address this defense, we convened a hearing on February 21, 2002 wherein we heard testimony from Ms. Gee and others and received exhibits and heard argument. We have also benefitted from post-hearing document submissions and additional briefing.

### The Factual Setting

It is undisputed that C GEE, Inc. did not exist when Judge Troutman signed the Consent Decree. The corporation was formed in Pennsylvania on January 12, 1996, and shortly thereafter, by a deed dated February 8, 1996, C GEE acquired the real estate that consists of a fifty-four acre cemetery now known as Orchard Hills Cemetery and Memorial Park. That cemetery had previously been known—at least at the time Judge Troutman signed the Consent Decree—as West Side Cemetery. A cemetery has existed on that land in the Borough of Shamokin Dam, Snyder County, Pennsylvania, for the past one hundred thirty-one years.

When the Consent Decree became effective, West Side Cemetery was owned by West Side Cemetery Company. This company was apparently controlled by people who sometime after January 31, 1989 allegedly absconded with cemetery trust funds that led to the insolvency of West Side Cemetery

---

**3.** The apparent cause of the hostilities was an incident involving Sherry Evans, a widow whose late husband is interred at Orchard Hills. After Mrs. Evans bought and had Fantini install a monument for her husband—a choice Mrs. Evans made because Fantini's charge was $200 less than Ms. Gee's—Mrs. Evans had a confrontation with Ms. Gee's son, Randy, that demonstrat-

ed for Mrs. Evans that Randy's customer relations skills left more than a little to be desired. Even though the incident ultimately passed without detriment to Mrs. Evans, she felt strongly enough about it to travel over a hundred and fifty miles from Sunbury to Philadelphia to testify before us on February 21.

Company. As a result, on January 7, 1994 a Pennsylvania corporation known as Hepran, Inc. acquired title to the cemetery's real estate by a Sheriff's Deed, which we received into evidence. Hepran, in turn, sold the real property to C GEE, Inc. on February 8, 1996.

Orchard Hills may fairly be described as a Mom and Pop cemetery *sans* Pop. Ms. Gee bought the business, through C GEE, including the real property for $90,000. She and her son have operated that business, and have spent much time in the so far unfruitful enterprise of recovering the stolen perpetual care funds.[4] She credibly testified that she knew nothing about this litigation, or about the Consent Decree, until she received counsel's bellicose letter in March of 2001.[5]

It is far from clear whether West Side Cemetery had actual notice of the 1988 settlement that Judge Troutman approved on January 31 of the following year. His September 14, 1988 Order required:

> [N]otice of the Pendency of this litigation and the proposed partial settlement thereof ... shall be sent ... to all of the business entities identified as members of the defendant class by individual notice. Such notice shall be mailed by·first class regular mail on or before the 3rd day of October, 1988.

Sept. 14, 1988 Order at ¶ 6.

More than a little surprisingly, although plaintiffs' class action counsel caused an affidavit of mailing to the plaintiff class to be filed in advance of Judge Troutman's January 5, 1989 fairness hearing—an affidavit

that identified all of the mailing's recipients—no such affidavit was filed regarding the mailed notice to the defendant class members. What did occur, however, was that lead counsel for the settling defendants, Robert C. Heim, Esq., made the following representations to Judge Troutman at the fairness hearing:

> I represent to the court that on October 31st, 1988, we sent notice to all cemeteries in this Commonwealth of Pennsylvania that we could locate. That is, we used a list compiled by the Cemetery Association of Pennsylvania, which was its regular mailing list, and a separate list which was compiled by the association of all of the non-member cemeteries in the state that it could come up with based on information available to it.
>
> There have been a number of agreements which were mailed that have been returned because the cemeteries are no longer in business or addresses have changed, but I believe we have done everything we possibly could to give notice to all cemeteries in the Commonwealth.

Tr. of Jan. 5, 1989 hearing at 3.

Judge Troutman's complete response to Mr. Heim's disclosure was, "Thank you." *Id.*

*The Burden of Proof*

 Inasmuch as we have no way of knowing whether West Side was among those cemeteries "that we could locate" from the unfiled lists Mr. Heim cited, it is by no means clear that this particular cemetery received the first class mailing Judge Troutman ordered.[6] Where a plaintiff class seeks

---

4. Apparently, the office of the Pennsylvania Attorney General has failed to find the offenders, notwithstanding prodding from Ms. Gee.

5. Plaintiff's attempts at the hearing to show some kind of constructive notice—because Ms. Gee used to work for Gilbraltar, which owed a cemetery in Allentown that was a named defendant—were far-fetched, and we find as a fact that Ms. Gee knew nothing about the case in general and of the Consent Decree in particular.

6. It does seem beyond doubt that Judge Troutman's October 3, 1988 deadline was missed by four weeks, but the record does not suggest that Judge Troutman took exception to this noncompliance. To the contrary, Judge Troutman in his Jan. 31, 1989 Order held:

> [T]hat the notice given to the plaintiff Class and the defendant Class pursuant to this Court's Order entered September 20, 1988 was the best notice practicable under the circumstances and constituted due and sufficient notice of the proposed settlement and the fairness hearing to all persons entitled to receive such notice....

Jan. 31, 1989 Order at 2.

This language would seem to be the only description of "those whom the court finds to be members of the class" within the meaning of Fed.R.Civ.P. 23(c)(3). Interestingly, we find no reference in the record as to a finding regarding what subdivision of Rule 23 these classes were contemplated to fall under; the references in the papers are exclusively to "Rule 23" in, *e.g.*, the forms of notice attached to Judge Troutman's

to impose a settlement's terms on a putative member of a defendant class, it bears the burden of demonstrating that the supposed member indeed received notice of the settlement.

While our research has found no case in these precise circumstances, the facts here demonstrate why those seeking to impose Consent Decrees' terms on unnamed putative defendant class members must bear this burden. Plaintiffs like Monument Builders or Fantini, who were active at the time of the settlement's approval, have far better access to the proof as to the identity of notice recipients.[7] By contrast, respondents in C GEE's position have no such access. Worse, if such respondents bore the burden, they would be faced with the daunting task of proving a negative—almost certainly an insuperable task for a party three steps removed from the entity that allegedly received notice over thirteen years ago.

■ It would seem plaintiff cannot carry its burden here. Indeed, all it can offer is a bald, unsubstantiated conclusion "that all active cemeteries in Pennsylvania must have been on these lists" that Mr. Heim mentioned. Due process and Rule 23(c) are not satisfied on any lawyer's must-have-beens. As there is no evidence that West Side Cemetery had the individualized notice Judge

Troutman required, plaintiff's and C GEE's motions must necessarily fail.

Plaintiff points out, however, that, in accordance with paragraph 7 of Judge Troutman's September 14, 1988 Order, class counsel did publish a summary notice of the settlement in the October, 1988 edition of *Inscriptions,* a newsletter of Monument Builders' dues paying members.[8] The idea seems to have been that this publication would serve as a backstop notice to both the plaintiff *and* defendant classes, an odd assumption for the cemetery defendant class. Perhaps recognizing the anomaly this presents, plaintiff's counsel represents to us that the Pennsylvania Cemetery Funeral Association's "membership directory and buyer's guide has, for years including to the present, contained a summary of the class action settlement agreement." Ltr. from Mitchell A. Kramer to the Court, March 1, 2002 at 2. But even accepting this representation, we have no way of knowing whether West Side Cemetery was even a member of the cemetery trade association in the late 1980's. Again, courts cannot impose Consent Decrees on people or firms based solely on conjecture.

Notwithstanding the failure to give West Side Cemetery the individualized, first class mail notice that Judge Troutman required,[9]

Sept. 14, 1988 Order. It would seem, however, that subdivision (b)(3) was the relevant subdivision of this particular class action because the notice contemplated, and Judge Troutman accepted, several opt-outs. As the Advisory Committee Notes to the 1966 amendments to Rule 23 state, the significance in this regard of the subdivision distinction is that, "[i]n a(b)(1) or (b)(2) action the judgment 'describes' the members of the class, but need not specify the individual members; in a(b)(3) action the judgment 'specifies' the individual members who have been identified and described the others." Fed.R.Civ.P. 23(c)(3) advisory committee's note.

7. The happenstance here that notice was accomplished through defense counsel does not change the ease of plaintiffs' access. Fantini's counsel here was present when Mr. Heim gave the vague report he did to Judge Troutman. Having heard in open court such an unspecific report, such counsel could have then and there cured the problem that faces us now, if only by asking Mr. Heim to file the mailing lists he mentioned. Having elected to accept the unparticularized account Mr. Heim gave the Court, it simply will not do to visit the consequences of counsel's

inaction on a new party so far removed from those long ago proceedings.

8. Plaintiff's counsel now advises that *Inscriptions'* name changed to *MBP Reporter,* and a class notice was published in that newsletter in September, 1989, eight months *after* Judge Troutman approved the settlement.

9. In its supplemental memorandum of law filed on March 15, 2002, plaintiff (at p. 3) makes much of the fact that Judge Troutman "expressly found that proper notice had been given." But Judge Troutman's finding that the notice was "the best notice practicable under the circumstances," Fed.R.Civ.P. 23(c)(2), is beside the point as to whether a putative defendant class member in fact had the notice that is the constitutional predicate to binding that absent person to a Consent Decree. Put another way, the question here is not whether Judge Troutman properly approved this dual class action settlement—a question now smacking of ancient history—but whether that settlement binds an absent, nonexistent party thirteen years later—which is the present question.

we will nevertheless assume, as the predicate for our alternative holding, that West Side Cemetery somehow, some way had constructive and constitutionally effectual notice of the pendency of the settlement in late 1988 or early 1989. The question before us then distills to whether the hypothesized notice to West Side Cemetery could bind all subsequent owners of that fee.

*Later Owners and the Consent Decree*

■ A fundamental premise for our consideration of this question is one the Supreme Court established over a half a century ago in *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The Court held in *Mullane* that it is "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314, 70 S.Ct. 652. Indeed, as Wright and Miller put it in their treatise, "[w]ithout the notice requirement it would be constitutionally impermissible to give the judgment binding effect against the absentee members of the class." 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1786 at 189 (1986).

Neither side here disputes this fundamental premise of Rule 23 jurisprudence. Nor is there any dispute that C GEE was not in existence until over six years after Judge Troutman signed the Consent Decree at issue here. At the hearing on February 21 and in post-hearing briefing, plaintiff maintains that the language of ¶ 2 of the Settlement Agreement, which the Consent Decree incorporated, includes later cemetery owners because, in effect, the Consent Decree runs with the real property of each cemetery in the defendant class.[10] Alternatively, plaintiff contends that Judge Troutman's January 31, 1989 Order acts· as a gloss on the Sherman Act, 15 U.S.C. § 1, and thus all—or at least

all in the Pennsylvania cemetery-related industry—are presumed to know of it, just as they are presumed to know all of the statutes Congress has enacted. Faithful to his duty of candor to the Court, plaintiff's counsel admits that no case has established either proposition.

While our research confirms that there is indeed no authoritative case, our consideration of this open question has been much aided by dicta in the Supreme Court's opinion in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). This leading case—known when it was in this Court as *Georgine v. Amchem Products, Inc.,* 878 F.Supp. 716 (E.D.Pa. 1994) and in our Court of Appeals by the same style at 83 F.3d 610 (3d Cir.1996)— involved a comprehensive settlement of asbestos-related litigation that, among other things, covered people who, though they had been exposed to asbestos products, had not yet manifested any asbestos-related disease.

For a variety of reasons, both our Court of Appeals and the Supreme Court took issue with Judge Reed's holding that the proposed settlement should be approved. Both appellate courts noted, for example, the antagonism within the class between those who had manifested asbestos-related disease and those who did not.

In her discussion for the Supreme Court regarding notice to future claimants, Justice Ginsburg wrote:

Impediments to the provision of adequate notice, the Third Circuit emphasized, rendered highly problematic any endeavor to tie to a settlement class persons with no perceptible asbestos-related disease at the time of the settlement.... Many persons in the exposure-only category, the Court of Appeals stressed, may not even know of their exposure, or realize the extent of the harm they may incur. Even if they fully appreciate the significance of class notice, those without current afflictions may not

---

10. Counsel at argument on February 21 explained that the coverage language of ¶ 2 of the Settlement Agreement—which ends with "members of the defendant class who do not file a timely election to opt out" and does *not* have following it the words "successors and as-

signs"—is because cemeteries are land that do not have "successors" or "assigns." There is no other language in the Settlement Agreement that could be fairly construed as implying any duty on defendant class members to advise later buyers of the Settlement Agreement's terms.

have the information or foresight needed to decide, intelligently, whether to stay in or opt out.

Family members of asbestos-exposed individuals may themselves fall prey to disease or may ultimately have ripe claims for loss of consortium. Yet large numbers of people in this category—future spouses and children of asbestos victims—could not be alerted to their class membership. And current spouses and children of the occupationally exposed may know nothing of that exposure.

Because we have concluded that the class in this case cannot satisfy the requirements of common issue predominance and adequacy of representation, we need not rule, definitively, on the notice given here. In accord with the Third Circuit, however, . . . we recognize the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous.

521 U.S. at 628, 117 S.Ct. 2231 (citations omitted [11]).

As we mentioned at the argument on February 21 and as is apparent in Justice Ginsburg's opinion, the Supreme Court came to no square holding on the problem of notice to future claimants. Echoing then-Judge Becker's concerns in our Court of Appeals quoted in the margin, she nevertheless stressed for her colleagues that "we recognize the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous." *Id.*

Of course, Justice Ginsburg was considering a plaintiff class that was expecting to receive significant benefits from the settlement. By contrast, a defendant class, as here, has burdens imposed upon it, and its benefits are only those of withheld or circumscribed future litigation. As witnessed here, those burdens can be as detailed as a chapter in the *Code of Federal Regulations.* It is thus not surprising that Wright and Miller have noted that in considering, for example, adequacy of representation, "some special problems or questions have surfaced that require particular attention" in the context of defendant class actions. *See* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1770 at 397–98 (1986).

Surely the burdens and lack of positive benefits on defendant classes require at least as strict an approach to the application of Rule 23 as the Courts suggested in *Amchem.* Ms. Gee and her Mom and Son cemetery present a signal instance of why this must be so.

Taking Justice Ginsburg's descriptions quoted above, Ms. Gee, as C GEE's by no means "amorphous" owner, was literally "unselfconscious" about this Consent Decree. She therefore was less informed than the hypothesized future claimants described in Justice Ginsburg's and Judge Becker's opinions in *Amchem.*

It is also important here to stress the consequences of this case involving real estate and not bodily injury. While land transfers no longer require "delivery of a twig from a tree or a clod of earth" [12], they still require formality and precision in the definition of fee ownership in the form of title. In the Commonwealth of Pennsylvania, the witnesses to the exchange of twigs and clods have been replaced by title insurance companies who duly note, after exhaustive search, the precise title conveyed *and* the restrictions and limitations thereto. To our knowledge, no title insurance company warrants that, besides searching the record title of real property, it also canvasses court dockets

---

**11.** Except to note that Justice Ginsburg cited pages 633–34 of Judge Becker's opinion, which among other things said:

Problems in adequately notifying and informing exposure-only plaintiffs of what is at stake in this class action may be insurmountable.

 \* \* \* \* \* \*

[I]t is obvious that if this class action settlement were approved, some plaintiffs would be

bound despite a complete lack of knowledge of the existence or terms of the class action. It is equally obvious that this situation raises serious fairness concerns.

**12.** Richard R. Powell and Michael Allan Wolf, 14 *Powell On Real Property* § 81 A. 01[2][a] at 81A–11–12 (2000).

throughout the sixty-seven counties and three federal districts in the Commonwealth of Pennsylvania to determine whether some decision or consent decree bears on the title absent the indexing of lis pendens.[13] As Powell points out, while

> lis pendens does not prevent transfer of property even though it is involved in a court action ... any transfer is made with the risk that the transfer may be nullified if the judgment goes against the transferor. The risk is sufficiently great that a title examiner or title insurer will protect itself by noting that the title is subject to pending litigation through the lis pendens doctrine.

Powell, *supra* note 9, § 82A.01[1] at 82A–5 (footnote omitted). Indeed, it is hard to conceive how title companies could warrant good title if we were to construe the Consent Decree as a judicially-imposed amendment of the fee titles of cemeteries in the Commonwealth of Pennsylvania without some form of notice on the judgment index against the subject properties.

Plaintiff's counsel here did not, as far as we have been informed, list this action or the settlement as lis pendens in accordance with the law of the Commonwealth of Pennsylvania. *See* 28 U.S.C. § 1964; 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2935 at 22–23 (1995). Nor did they give notice by way of lis pendens in accordance with the predecessor of our Local R. Civ. P. 4.1.1.[14]

As plaintiff did not list this action or the settlement as lis pendens, subsequent purchasers of the real property of Pennsylvania cemeteries cannot be deemed to have received legal notice of the pendency of this dual class action.[15]

In response to our Order of February 27, 2002 inquiring about whether plaintiff ever filed lis pendens, counsel forthrightly reported that it did not. Amazingly, however, in view of plaintiff's current position that the Consent Decree encumbers the real property of the cemeteries, counsel states that, "the class action did not question title to the land comprising all cemeteries in Pennsylvania." Ltr. of Mitchell A. Kramer to the Court, Mar. 6, 2002 at 2. Plaintiff simply cannot have it both ways. Either the settlement did not affect the title to the real property of the cemeteries, or, as plaintiff argued on February 21, 2002, it did. There cannot have been one answer in the late 1980's and another one now.

Putting aside what seems to be a hopeless internal contradiction, no case has been brought to our attention that in any way supports plaintiff's expansive view to the contrary as to *constructive* amendment of fee titles. This case will not provide the occasion to adopt such a proposition.

■ For cognate reasons, we also reject plaintiff's proffered notion that the Consent Decree is tantamount to a gloss on the Sherman Act to which all Pennsylvania cemetery

---

**13.** As *Black's* defines it, lis pendens is "a notice filed on public records for the purpose of warning all persons that the title to certain property is in litigation, and that they are in danger of being bound by an adverse judgment." *Black's Law Dictionary* 932 (6th ed.1990). *See also Frankel v. Northeast Land Co.,* 391 Pa.Super. 226, 570 A.2d 1065 (1990).

**14.** This Rule now requires that "Whenever any proceeding involving title to real property shall be commenced in this Court, and a party desires to give notice thereof by way of lis pendens, counsel for said party, at any time after commencement of said proceedings, shall file with the Clerk a written order directing him to enter said proceedings upon the judgment index, which order shall designate the persons against whom said proceeding is to be indexed." The prior iteration of the Rule, effective August 1, 1980, differed only in that it was numbered as Local Rule 32 and did not capitalize the word "Court".

**15.** C GEE's counsel unsurprisingly reports that the Consent Decree "is not in [C GEE's] chain of title, as it does not show on the judgment indices in the Office of the Prothonotary of Snyder County." Resp't's Mem. per Order of Feb. 21, 2002 at 7. As C GEE's counsel points out, the interposition of the Sheriff's sale between West Side's ownership of the fee and C GEE's purchase of it sunders any privity that might have been deemed to exist between West Side and C GEE. *See DeAngelis v. Newman,* 350 Pa.Super. 536, 504 A.2d 1279, 1284 (1986) ("The general rule in Pennsylvania is that judicial sales divest all prior and subsequent liens on the property sold unless such liens are presented by statute" [*e.g.,* prior mortgage, 42 Pa. Cons.Stat. Ann. § 8152 (1998)]).

owners are charged to have knowledge. Again, no case has been brought to our attention adopting such a reading of the law.

To impose such knowledge on future owners like Ms. Gee would, at the very least, raise the grave due process concerns that both the Supreme Court and our Court of Appeals identified in *Amchem.* It is one thing to charge people with knowledge of readily ascertainable statutes. It is quite another to hold them knowledgeable of unpublished Consent Decrees. As the stewards of rules which the Judicial Branch brings into existence, federal courts must construe Rule 23 in ways that avoid constitutional objection. *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 845, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) ("the Rules Enabling Act and the general doctrine of constitutional avoidance" provide "further counsel against adventurous application" of Rule 23). We therefore reject plaintiff's alternative approach under the Sherman Act.

Under these circumstances, given the presence of an "unselfconscious" member of this industry who did not have actual notice of the settlement and did not succeed one who did, we cannot construe Rule 23 so expansively to include her without offending notions of fundamental fairness that are at the heart of the Due Process Clause. We therefore decline plaintiff's invitation to make such an "adventurous application" of that Rule. Thus C GEE is not subject to, and may not benefit from, the 1989 Consent Decree, and so both motions founded on that Decree must fail.

### ORDER

AND NOW, this 18th day of March, 2002, upon consideration of plaintiff's motion for civil contempt and to compel compliance with court approved consent decree (docket no. 356), and the cross-motion for contempt respondent C GEE, Inc. filed (docket no. 364), and after a hearing on February 21, 2002, and after consideration of supplemental briefing and documents submitted thereafter in accordance with this Court's post-hearing Orders, and upon the findings of fact and conclusions of law contained in the accompanying memorandum, it is hereby ORDERED that the motions are DENIED.

